**IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| GOSECURE, INC. <br><br> Plaintiff, <br><br> v. <br><br> CROWDSTRIKE, INC., and <br> CROWDSTRIKE HOLDINGS, INC. <br><br> Defendants. | Case No. 1:25-cv-02088 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff GoSecure, Inc. ("GoSecure" or "Plaintiff") brings this patent infringement action against Defendants CrowdStrike, Inc. and CrowdStrike Holdings, Inc. ("CrowdStrike" or "Defendants").

**NATURE OF THE ACTION**

1. This is a civil action for infringement of United States Patent No. 10,104,099 ("'099 patent" or "Asserted Patent") under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

**THE PARTIES**

2. Plaintiff GoSecure, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 13220 Evening Creek Dr. S, Suite 107, San Diego, CA 92128. GoSecure has employees located throughout the United States and Canada, including in Boston, Montreal, and San Diego.

3. GoSecure is a privately held company incorporated in 2004 for the purpose of developing and commercializing products and services protecting customers from cyberattacks. Today, GoSecure continues to provide Endpoint Detection and Response ("EDR") products and

1

services using the techniques described in the '099 patent, including its flagship Titan Platform, to customers who operate throughout the United States and Canada, including within this District. CounterTack, the assignee named on the face of the '099 patent, acquired GoSecure in 2018 and the company became known as GoSecure, the assignee of record of the '099 patent.

4. From its inception, GoSecure has been focused on innovating the field of cybersecurity to help companies detect and thwart malware attacks. At the time, the data security industry was laser-focused on identifying and neutralizing malware and viruses at the entry-point to a network using conventional intrusion detection systems (IDS) and intrusion prevention systems (IPS) that relied on the use of a library of known fingerprints to detect repeated occurrences of previously-identified malware. GoSecure, recognizing that attacks would become more sophisticated and that such conventional antivirus software would no longer be able to protect endpoint computers, developed innovative techniques for defending against sophisticated cyberattacks and obtained over a dozen patents for its technology.

5. For example, GoSecure developed innovative techniques for identifying and responding to so-called "zero-day attacks," against which then-existing IDS/IPS were ineffective. GoSecure recognized that zero-day attacks were able to exploit previously unknown security vulnerabilities, such that there was no malware fingerprint that conventional IDS/IPS could use to detect and thwart such attacks. Accordingly, GoSecure developed and patented techniques for identifying unauthorized activities on a computer system, analyzing those activities, and sharing the analysis with other endpoint devices. That work resulted in solutions that were significantly more efficient, effective, robust, and scalable than prior art systems, to name just a few benefits.

6. On information and belief, Defendant CrowdStrike Holdings, Inc. is a Delaware corporation with its principal executive office in Austin. Defendant CrowdStrike Holdings, Inc.

is the parent of and directly and wholly owns Defendant CrowdStrike, Inc. On information and belief, CrowdStrike Holdings, Inc. controls or otherwise directs and authorizes the activities of Defendant CrowdStrike, Inc.

7. On information and belief, Defendant CrowdStrike, Inc. is a Delaware corporation and maintains multiple offices in Texas, including its largest office in Austin. Defendant CrowdStrike, Inc. is registered with the Secretary of State to conduct business in Texas for the purpose of sales of cloud-delivered cybersecurity solutions to customers in Texas.

8. CrowdStrike was co-founded in or around 2011 by Mr. George Kurtz and Mr. Dmitri Alperovitch. While founding CrowdStrike, Mr. Alperovitch served as a member of GoSecure's Board of Directors, a position he held from November 2011 until May 2012.

9. Unbeknownst to GoSecure at the time, Mr. Alperovitch and Mr. Kurtz intended for CrowdStrike to provide offerings that would compete with GoSecure's technology. To that end, Mr. Alperovitch spent his time on GoSecure's Board of Directors gathering information about GoSecure's technology. During his time on GoSecure's Board of Directors, Mr. Alperovitch attended numerous Board meetings at which he received detailed information regarding GoSecure's technology, product roadmap, and patent applications. In or around May 2012—after Mr. Alperovitch had spent six months gathering confidential information while "serving" on GoSecure's Board of Directors—GoSecure sensed there was a conflict of interest and asked Mr. Alperovitch to step down from the Board. While Mr. Alperovitch attributed his decision to a change in GoSecure's strategy to move into the endpoint security market, GoSecure's strategy had been to move into the endpoint security market since before Mr. Alperovitch's first introduction to GoSecure, and Mr. Alperovitch was well aware of that strategy based on his exposure to GoSecure's technical documents and discussions with the Board.

10. After Mr. Alperovitch left GoSecure, he continued working at CrowdStrike as its chief technology officer until 2020. On information and belief, knowing the value of GoSecure's technology, he personally continued to stay abreast of the industry and particularly of GoSecure's product offerings and patent applications and patents and encouraged other members of his team to do the same throughout that tenure.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1338(a) and the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

12. The Court has personal jurisdiction over CrowdStrike Holdings, Inc. because it has its principal place of business in this District and regularly conducts business in the State of Texas and in this District, including by directing and controlling CrowdStrike Inc.'s infringing operations in Texas and in this District.

13. Additionally or alternatively, the Court has personal jurisdiction over Defendants because both Defendants have substantial, continuous, and systematic contacts with this State and the Western District of Texas such that the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. For example, Defendants have committed and continue to commit acts of infringement in this District. Defendants have made, used (including to protect their own devices), sold, offered for sale, imported into, developed, and tested the Accused Products in this District. Further, Defendants have induced others to use the Accused Products by acts carried out by Defendants' employees in this District, and end-users have used the Accused Products in this District. As such, jurisdiction is consistent with the principles of due process and the Texas Long Arm Statute Tex. Civ. Prac. & Rem. Code. §§ 17.041, *et seq*. Indeed,

Defendants have argued to this Court that a patent infringement action involving the same Falcon Platform accused of infringement in this case could have been brought in this District, in Austin.

14. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b) because, upon information and belief, Defendants have regular and systematic contacts within this District. On information and belief, CrowdStrike Holdings, Inc. has its principal executive office in this District and CrowdStrike, Inc. has its largest office in this District, and both Defendants have committed acts of infringement within this District.

15. For example, CrowdStrike, Inc.'s business includes operating systems, using software, providing services, and/or engaging in activities in Texas and in this District that infringe one or more claims of the Asserted Patent, as well as inducing and contributing to the direct infringement of others through acts in this District. On information and belief, CrowdStrike Holdings, Inc. directs, controls, and profits from Defendant CrowdStrike, Inc.'s infringing activities in this District.

16. Defendants have also, directly and through their extensive network of partnerships, including through local IT service providers, purposefully and voluntarily placed infringing security software and services into the stream of commerce in this District.

17. On information and belief, Defendant CrowdStrike, Inc. has hundreds of employees in this District—including positions in engineering, sales, marketing, and finance—who have relevant information, including information concerning the products and services CrowdStrike provides, how those products operate, and how CrowdStrike communicates with current and prospective customers regarding the products and services CrowdStrike provides.

18. In particular, on information and belief, engineers responsible for designing, developing, maintaining, and/or updating the Accused Products and uniquely knowledgeable

about the operation of the Accused Products are located in Austin, Texas. Likewise, CrowdStrike employees uniquely knowledgeable about the marketing and sales of the Accused Products are located in this District.

19. CrowdStrike has committed acts of infringement within this District. For example, CrowdStrike uses and sells the Accused Products in this District and instructs its customers to use the Accused Products in this District in a way that CrowdStrike either knows infringes the '099 patent or reasonably should know infringes the '099 patent.

20. Additionally or alternatively, CrowdStrike makes, uses, advertises, offers for sale, and/or sells endpoint security software (including the Accused Products) and provides security services in support of the Accused Products in this District directly and/or through its partnership with businesses in the State of Texas and in this District.

21. On information and belief, CrowdStrike encourages and induces its customers to perform the methods claimed in the Asserted Patent. For example, CrowdStrike makes its security services available on its website, widely advertises those services, provides applications that allow partners and users to access those services, provides instructions for installing and maintaining those products, and provides technical support to users, including from its offices in this District.

## THE ASSERTED PATENT

22. The '099 patent is entitled "System and method for monitoring a computer system using machine interpretable code," and was issued on October 16, 2018. GoSecure owns the entire right, title, and interest in and to the '099 patent, a copy of which is attached to this Complaint as Exhibit 1.

23. The '099 patent is generally directed to "systems and methods for monitoring one or more computer systems over computer networks." '099 patent at 1:33-35. As the '099 patent

recognizes, "networked computers are … vulnerable to attacks, unwanted intrusions, and unauthorized access." *Id.* at 1:36-38. While "[c]ertain existing network security systems have been developed to protect computers from attacks, unwanted intrusions, unauthorized access, and other malicious activities" (*id.* at 1:39-41), those techniques are largely obsolete when it comes to addressing "the so-called zero-day attack that exploits security vulnerabilities previously unknown to software developers or system operators." *Id.* at 1:57-59. "Until the fingerprints [for such zero-day attacks] are identified, attacks exploiting the same security vulnerabilities continue without detection by the network security systems." *Id.* at 1:63-65. "However, identifying the fingerprints of malicious activities in the middle of numerous other non-malicious processes is not a trivial task." *Id.* at 1:65-67.

24.   Moreover, while such malicious processes "can be better detected at a low level in a computer system (e.g., within an operating system of the computer system), … distributing detection tools that operate at a low level in computer systems are challenging, because any errors in the detection tool … may cause a system failure or crash." '099 patent at 2:1-7. "In addition, distribution of a detection tool that operates at a low level often requires rebooting the computer system, which is not suitable for computer systems that require continuous and uninterrupted operations." *Id.* at 1:7-10. The '099 patent thus recognizes that "there is a great need for improved methods of distributing detection tools for detecting malicious activities" as well as "improved methods for monitoring computer systems." *Id.* at 2:12-19. The '099 patent discloses and claims inventive techniques that address such needs.

25.   Claim 1 of the '099 patent recites:

> 1. A computer implemented method of monitoring a collector computer system, the collector computer system comprising one or more processors and memory storing an interpreter and compiled

7

instructions for execution by the one or more processors, said method comprising:

receiving, by the collector computer system, machine interpretable code that is configured for interpretation by the interpreter, wherein the machine interpretable code is not directly executable by the one or more processors and the machine interpretable code includes: information identifying a first set of one or more monitoring targets within the collector computer system, a method for monitoring the first set of one or more monitoring targets, and predefined reporting criteria;

interpreting, by the collector computer system, the machine interpretable code with the interpreter to obtain the first set of one or more monitoring targets, the method for monitoring the first set of one or more monitoring targets, and the predefined reporting criteria;

monitoring, by the collector computer system, at least a subset of the first set of one or more monitoring targets for candidate activity that satisfies the predefined reporting criteria by executing compiled instructions that correspond to the method for monitoring the first set of one or more monitoring targets;

obtaining, by the collector computer system, candidate event information that is associated with the candidate activity; and

reporting, by the collector computer system, the candidate event information to a computer system that is distinct from the collector computer system,

wherein the compiled instructions are generated by a compiler in a second computer system that is distinct from the collector computer system, and the method includes receiving the compiled instructions from the second computer system for storing the compiled instructions in the memory.

26. Claim 1 includes limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well-known or routine at the time of the inventions. For example, claim 1 recites "[a] computer implemented method of monitoring a collector computer system, the collector computer system comprising one or more processors and memory

storing an interpreter and compiled instructions for execution by the one or more processors." The method of claim 1 includes receiving and interpreting code in order to "obtain the first set of one or more monitoring targets, the method for monitoring the first set of one or more monitoring targets, and the predefined reporting criteria." The method of claim 1 further includes "monitoring … for candidate activity that satisfies the predefined reporting criteria by executing compiled instructions that correspond to the method for monitoring the first set of one or more monitoring targets."

27. By leveraging code that is not directly executable by the processors of the collector computer system but is instead interpreted by an interpreter stored within the memory of the collector computer system, claim 1 provides techniques that can dynamically update monitoring targets at a low level (e.g., the operating system level) while mitigating impact on the collector computer system and without requiring a full system reboot. That is, by separating monitoring parameters, which are delivered as safe, interpretable script (e.g., configuration data in a format like Python or Protocol Buffers that specify what activity to monitor, how to monitor it, and when to report), from the low-level monitoring mechanisms (delivered as pre-installed, verified compiled instructions), claim 1 enables quick, safe, and remote reconfiguration of low-level monitoring, enabling dynamic updates without substantially interrupting system operation, among other benefits. Claim 1 thus covers techniques that are fundamentally different from how prior art systems operated and that provide benefits that such prior art systems could not achieve.

28. Additional claims require limitations that, alone or in combination, are directed to inventive concepts that also were unconventional and not well-known or routine. For example, claim 3 specifies various types of monitoring targets contemplated by the '099 patent and claim 4 recites various predefined reporting criteria, including (for example) "one or more process names

associated with the candidate activity." As another example, claim 8 requires "subsequent to reporting the obtained information: receiving instruction to terminate the candidate activity" and "terminating the candidate activity," thereby providing additional security benefits.

**CLAIMS FOR PATENT INFRINGEMENT**

29. CrowdStrike designs, offers, sells, and uses malware detection and endpoint protection platforms for individuals and enterprises that incorporate GoSecure's patented technologies. These products include CrowdStrike's "Falcon Platform," which CrowdStrike offers to customers as "bundles that fit a variety of business needs and budgets" including Falcon Go, Falcon Pro, and Falcon Enterprise (collectively, "Falcon Platform" or "Accused Products"). As explained further below, the Accused Products practice the methods claimed in the '099 patent.

**Big protection at an affordable price**

CrowdStrike offers bundles that fit a variety of business needs and budgets, so no one has to go unprotected.

Explore bundles →

**Falcon Go**
Annual price:
**$59.99**/device[1]

What you get:
- Next-gen antivirus
- Device control
- Mobile device protection
- Express support

**Falcon Pro**
Annual price:
**$99.99**/device

What you get:
- Next-gen antivirus
- Device control
- Firewall management
- Express support

**Falcon Enterprise**
Annual price:
**$184.99**/device

Get everything in Pro, plus:
- Endpoint detection and response
- Threat hunting

30. The Falcon Platform is implemented on endpoint computers using a software called the Falcon sensor or Falcon agent that protects computers and supports the Falcon Platform's cloud infrastructure. The Falcon Platform operates on multiple devices using the Falcon agent including

workstations, desktops, laptops, and other traditional end user computer devices, servers, virtual machines, cloud containers, cloud networks, mobile computer devices such as smartphones, and Internet of Things devices.

31. The allegations provided below are exemplary and without prejudice to GoSecure's infringement contentions with respect to the Accused Products.

32. As detailed below, each element of at least one claim of the Asserted Patent is literally present in the Accused Products. To the extent that any element is not literally present or practiced, each such element is present or practiced under the doctrine of equivalents.

## COUNT I
## Infringement of the '099 Patent

33. GoSecure realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

34. CrowdStrike has infringed and continues to infringe one or more claims of the '099 patent in violation of 35 U.S.C. § 271(a) by, among other things, its making, testing, and using the Accused Products in the United States, including in this District without the permission, consent, authorization, or license of GoSecure. The Accused Products, at least when used for their ordinary and customary purposes, practice each element of at least claim 1 of the '099 patent.

35. For example, on information and belief, CrowdStrike performs the claimed method in the United States and in this District in an infringing manner as described herein by using the Accused Products to protect its own computer and network operations.

36. On information and belief, CrowdStrike also performs the claimed method in an infringing manner in the United States and in this District when testing the Accused Products and

corresponding systems and/or when providing or administering services to third parties, customers, and partners using the Accused Products.

37. To the extent the preamble is limiting, the Accused Products perform "[a] computer implemented method of monitoring a collector computer system, the collector computer system comprising one or more processors and memory storing an interpreter and compiled instructions for execution by the one or more processors." For example, the CrowdStrike Falcon Platform includes the CrowdStrike Falcon sensor (also referred to as the Falcon agent), which is deployed on an endpoint device (e.g., a "collector computer system") that has processors and memory. The Falcon sensor is stored in the memory of the endpoint device and comprises an interpreter and compiled instructions for execution by the processors of the endpoint device.

38. The computer-implemented method performed by the Accused Products includes "receiving, by the collector computer system, machine interpretable code that is configured for interpretation by the interpreter, wherein the machine interpretable code is not directly executable by the one or more processors and the machine interpretable code includes: information identifying a first set of one or more monitoring targets within the collector computer system, a method for monitoring the first set of one or more monitoring targets, and predefined reporting criteria." The CrowdStrike Falcon sensor includes a detection engine, which combines built-in sensor content ("compiled instructions for execution by the one or more processors") with Rapid Response Content ("machine interpretable code") delivered from the cloud. This Rapid Response Content is used to gather telemetry, identify indicators of adversary behavior, and augment novel detections and preventions on the sensor without requiring sensor code changes. The Rapid Response Content is not directly executable by the one or more processors of the collector computer system.

For example, the image below shows a screenshot of the Falcon sensor running on an endpoint device and being connected to the cloud.



39. The method performed by the Accused Products includes "interpreting, by the collector computer system, the machine interpretable code with the interpreter to obtain the first set of one or more monitoring targets, the method for monitoring the first set of one or more monitoring targets, and the predefined reporting criteria." For example, once the Rapid Response Content is received by the Falcon sensor, the Rapid Response Content is interpreted by the sensor's content interpreter, for example by using a regular-expression based engine.

40. The method performed by the Accused Products includes "monitoring, by the collector computer system, at least a subset of the first set of one or more monitoring targets for candidate activity that satisfies the predefined reporting criteria by executing compiled instructions that correspond to the method for monitoring the first set of one or more monitoring targets." For

example, each Rapid Response Content channel file is associated with a specific template that is built into the Falcon sensor. The template provides the content interpreter in the Falcon Sensor with activity data and graph context, which can be matched against the Rapid Response Content that is delivered from the cloud.

41. The method performed by the Accused Products includes "obtaining, by the collector computer system, candidate event information that is associated with the candidate activity." For example, the Falcon sensor correlates context from its local graph store with live system activity into behaviors and indicators of attack (IOAs) as part of an ongoing process of refinement.

42. The method performed by the Accused Products includes "reporting, by the collector computer system, the candidate event information to a computer system that is distinct from the collector computer system." For example, the information gathered from endpoints is stored in the CrowdStrike cloud via the Falcon Platform using a situational model to keep track of all the relationships and contacts between each endpoint event.

43. In the method performed by the Accused Products, "the compiled instructions are generated by a compiler in a second computer system that is distinct from the collector computer system, and the method includes receiving the compiled instructions from the second computer system for storing the compiled instructions in the memory." For example, the CrowdStrike Falcon sensor includes a sensor detection engine combining built-in sensor content with Rapid Response Content delivered from the cloud. The built-in snsor content (i.e., the "compiled instructions") is compiled in a second computer system before being stored in the memory of the endpoint device (i.e., the "collector computer system").

44. In addition to directly infringing the '099 patent, as discussed above, CrowdStrike knew or was willfully blind to the fact that it was inducing infringement of at least claim 1 of the '099 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to directly infringe by performing the method of at least claim 1 in the United States. CrowdStrike instructs its customers regarding how to install and operate the Accused Products in an infringing manner, including by providing user guides and customer support.

45. CrowdStrike knows about the '099 patent at least from its receipt of this Complaint. On information and belief, CrowdStrike knew about the existence of the '099 patent prior to its receipt of this Complaint. For example, in April 2023, after being sued by OpenText for patent infringement, and recognizing the foundational nature of GoSecure's technology, CrowdStrike served a subpoena on GoSecure related to prior art productions and related documentation that GoSecure had sold beginning as early as April 2013. Further, GoSecure has asserted other patents as infringed by CrowdStrike. On information and belief, CrowdStrike would have learned of the '099 patent when conducting diligence on additional patents GoSecure, as searching for all active patents assigned to GoSecure on Google Patents produces only 9 results, including the '099 patent. CrowdStrike's acts of infringement have thus been knowing, intentional, and willful (or willfully blind) and in disregard for the '099 patent, without any reasonable basis for believing that it had a right to engage in the infringing conduct.

46. CrowdStrike is also liable for contributory infringement of at least claim 1 of the '099 patent under 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that it was contributing to infringement by providing to its customers and offering to sell and selling in the United States the Accused Products.

47. The Accused Products are software that perform the method of at least claim 1 of the '099 patent when installed on a computer device having at least one processor and memory and used for their intended purpose within the United States. Further, the Accused Products are not a staple article or commodity of commerce suitable for substantial noninfringing use.

48. Additionally or alternatively, CrowdStrike has been willfully blind regarding the existence of the '099 patent. CrowdStrike closely monitors the technology offerings and intellectual property of other EDR providers, as evidenced by CrowdStrike's website, which advertises comparisons with other companies. On information and belief, to the extent CrowdStrike did not actually know about the existence of the '099 patent prior to its receipt of this Complaint, CrowdStrike's ignorance was based on its own willful blindness to GoSecure's foundational EDR technology. CrowdStrike not only recognized the foundational nature of GoSecure's technology, as demonstrated by its subpoena to GoSecure for prior art, CrowdStrike has been involved in active litigation with GoSecure for nearly 2 years, during which CrowdStrike has filed for *inter partes* review of GoSecure's patents based on other GoSecure patents. To the extent CrowdStrike did not learn about the existence of the '099 patent during that period of time, its failure to do so was based on deliberate actions CrowdStrike took to avoid learning about any other GoSecure patents. CrowdStrike's acts of infringement have thus been knowing, intentional, and willful (or willfully blind) and in disregard for the '099 patent, without any reasonable basis for believing that it had a right to engage in the infringing conduct.

49. CrowdStrike's acts of infringement of the '099 patent have injured and continue to injure GoSecure in an amount to be proven at trial, but not less than a reasonable royalty. GoSecure has suffered and continues to suffer damages, including lost profits, as a result of CrowdStrike's infringement of the '099 patent.

50. CrowdStrike's infringement has caused and is continuing to cause damage and irreparable harm to GoSecure, and GoSecure will continue to suffer damage and irreparable harm unless and until that infringement is enjoined by this Court.

51. This case is exceptional and, therefore, GoSecure is entitled to an award of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.

## JURY DEMAND

52. GoSecure demands a jury trial as to all issues that are triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, GoSecure respectfully prays for relief as follows:

A. Judgment that Defendants are liable for direct infringement, and/or inducing the infringement, and/or contributing to the infringement of one or more claims of the Asserted Patent;

B. An Order preliminarily and permanently enjoining Defendants and their respective officers, agents, employees, and those in privity or in active concert or participation with them, from further infringement of the Asserted Patent;

C. Compensatory damages in an amount according to proof, including lost profits, and in any event no less than a reasonable royalty;

D. Increased damages under 35 U.S.C. § 284;

E. Pre-judgment interest;

F. Post-judgment interest;

G. Attorneys' fees and costs based on this being an exceptional case pursuant to 35 U.S.C. § 285, including pre-judgment interest on such fees and costs;

  H. An accounting and/or supplemental damages for all damages incurred by Plaintiff from six years prior to the date this lawsuit was filed through entry of a final, non-appealable judgment;

  I. If this Court declines to enjoin Defendants from infringing the Asserted Patent, damages for future infringement in lieu of an injunction; and

  J. Any further relief that the Court deems just and proper.

| | |
|---|---|
| DATED: December 19, 2025 | Respectfully submitted, |
| | */s/ Giri Pathmanaban* |

                                      **CLEARY GOTTLIEB STEEN & HAMILTON LLP**

S. Giri Pathmanaban (SBN 24074865)
   gpathmanaban@cgsh.com
1841 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 815-4100
Fax: (650) 815-4199

Clement Naples (*pro hac forthcoming*)
   cnaples@cgsh.com
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Fax: (212) 225-3999

Thomas Yeh (*pro hac forthcoming*)
   tyeh@cgsh.com
650 California St., Suite 2400
San Francisco, California 94108
Telephone: (415) 796-4400
Fax: (415) 796-4499

Daniel Todd (*pro hac forthcoming*)
   dtodd@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500
Fax: (650) 815-4199

**ATTORNEYS FOR PLAINTIFF GOSECURE, INC.**